896 F.Supp. 424 (1995)
UNITED STATES of America
v.
Theresa J. BUSH.
Crim. A. No. 94-185.
United States District Court, E.D. Pennsylvania.
August 7, 1995.
Ronald H. Levine, Assistant United States Attorney, Philadelphia, PA, for U.S.
*425 Joseph Miller, Federal Defender Ass'n of Philadelphia, Philadelphia, PA, for Theresa J. Bush.

MEMORANDUM
DALZELL, District Judge.
The Government raises a novel issue with the motion it filed, under Federal Rule of Criminal Procedure 35(b), for a reduction in defendant's sixteen month sentence. Though the Rule empowers the Court, on the Government's motion within a year after sentence, to "reduce a sentence to reflect a defendant's subsequent, substantial assistance", the Government here seeks to win this benefit for a defendant based upon the unsolicited "subsequent, substantial assistance" of her paramour.
A brief rehearsal of history is relevant to our disposition of the Government's motion.

Factual Background
On April 26, 1994, a Grand Jury indicted Bush in five counts of making false statements in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6), and in five counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Bush pleaded guilty on July 13, 1994 to one false statement count and one possession count, but stipulated to having committed the other eight charged offenses, and further stipulated that, for purposes of her Sentencing Guidelines range; those eight crimes "shall be treated as if ... [she] had been convicted of additional counts charging these offenses." United States v. Bush, 56 F.3d 536, 537 (3d Cir.1995).
At the October 14, 1994 sentencing hearing, there was a spirited dispute between the Government and Bush as to the proper application of the grouping principles of U.S.S.G. § 3D1.4 (1990 Manual). In essence, the parties diverged as to whether Bush's purchase of eight weapons on five separate occasions should be counted as five "groups" or one. We found three "groups", basing our decision in part upon Bush's shifting explanations for her purchases. United States v. Bush, No. 94-185, 1994 WL 570169 (E.D.Pa. October 14, 1994) (Memorandum and Order). It is upon these shifting explanations that we now focus.
On December 4, 1992, agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") interviewed Bush about her many purchases. Bush proffered a pacifist version of a Bonnie-and-Clyde story, telling them that she bought the guns because "she and her common-law husband, Cedric Pinckney, liked to shoot at Colosimo's range." Presentence Investigation Report ("PSI") ¶ 7. She also implied that she knew, but refused to say, where the guns were. Id.; see also Bush, 56 F.3d at 541-42.
Two years later, Bush gave her Probation Officer another explanation. During the presentence investigation she offered a 1990s version of Little Women and suggested that she bought the guns for protection for her mother and sisters. She also said that she no longer knew where the guns were, id., and freely admitted that none of the guns had ever reached their intended recipients, id. ¶ 10.
Since we did not see how either explanation could plausibly explain the purchase of four semi-automatic weapons on November 29, 1990, we charitably inferred to Bush a third motive, which we euphemistically referred to as the "mystery motive." Bush, 56 F.3d at 541.
At her sentencing hearing, Bush gave us support for the use of the word mystery when she told us:
... O.K. I didn't do it to hurt nobody. All right. Only God knows what I did it for, and I came to you all with the truth and the whole truth.
10/14/94 Hrg. Tr. at 32.
In the Court of Appeals, Bush took us to task for not recalling that she had seven sisters, rather than one, and thus proffered to the panel a seven-guns-for-seven-sisters theory to justify only one "group".[1] In a published opinion, the Court of Appeals was unpersuaded and, indeed, noted that "the district court probably would have acted well *426 within its discretion had it inferred discrete motives from discrete purchases, and created five separate groups." Bush, 56 F.3d at 541.
A month after the affirmance from the Court of Appeals, the Government filed the instant Rule 35(b) motion predicated on the cooperation of one Cedric Pinckney, also known as "Saad Abdul Salaam", Bush's paramour. Pinckney was arrested with Bush, but charged with different offenses. The Government advises us that Pinckney was convicted in September of 1994 in the United States District Court for the District of Delaware of armed bank robbery, and was later sentenced to one hundred months in jail. Government's mot. ¶ 4.
In February of 1995, Pinckney began cooperating with the Government, and ultimately admitted that he and Bush purchased between thirty and fifty firearms between 1990 and May of 1993. Government's mot. ¶ 7. Pinckney needed Bush to act as a straw purchaser, since his own purchases had come under "police scrutiny". Government's Supp. Mem. ex. A.
Not surprisingly, the Government was most interested in a transaction between Pinckney and another person whom he had met at a mosque in either Philadelphia or Newark. In Pinckney's statement to the FBI, attached to the Government's supplemental memorandum filed on July 31, 1995, Pinckney detailed his gun purchases through Bush, and his subsequent sale of guns to another individual (whose name is redacted in the statement) who was a "brother from the mosque". This unidentified person is a co-conspirator in the World Trade Center bombing prosecution.
At page 4 of Pinckney's statement, he is recorded as saying that he:
... needed BUSH to make the purchases for ____. BUSH originally refused because a few weeks earlier she had purchased a 9mm. pistol for PINCKNEY as a present. PINCKNEY preceded [sic] to sell this gun which infuriated BUSH. PINCKNEY coaxed her into purchasing the weapons stating they needed rent money.
That evening, ____ called from the 30th Street train station and PINCKNEY and BUSH picked him up.
They drove to LOU'S LOANS where PINCKNEY told ____ to pick out what he wanted and he (PINCKNEY) would do the required paperwork.
____ picked out a couple of DAVIS .380 caliber semi-automatic pistols, and a 9mm. Italian Fitalia.
The statement then details the subsequent purchase of the Davis .380 caliber pistols that, it will be recalled, Bush purchased on November 29, 1990, together with the 9mm Tanfoglio semi-automatic handgun.
The Government thought Pinckney's testimony "sufficiently material and credible that he testified this spring as a witness in the World Trade Tower-Harbor Tunnel Bombing RICO trial presently underway in the Southern District of New York." Government's motion ¶ 7.
Assuming, as the Government and Bush now wish us to believe, that Pinckney's account constitutes the truth, Bush lied to the ATF agent, her Probation Officer, this Court, and the Court of Appeals.

What "Assistance" Did Bush Provide?
In ¶ 5 of its motion, the Government offered the following Delphic description of Bush's "subsequent, substantial assistance":
After the sentencings of Bush and Pinckney, Pinckney began to cooperate with the government. This was done with Bush's support, and to that extent, Bush played some role in directing Pinckney's assistance. Pinckney himself insisted that he was coming forward because his wife was in jail and that he was doing this to help his wife (as well as himself).
Government's motion at ¶ 5 (footnote omitted).
At the hearing on the Government's motion on August 3, 1995, we asked the Government if it could put any flesh on the vaporous locution, "Bush's support". We were invited to hear Bush's own words, which we did.
Bush reported that Pinckney was jailed as soon as he was arrested, and thus she was free to see him in person before her November *427 1, 1994 surrender date. She testified that at no time before November 1 did she suggest that Pinckney cooperate with the Government.
To the contrary, it was only after Bush was incarcerated that the subject arose. Specifically, Bush testified that Pinckney called her and informed her "that he was talking to them", i.e., the Government. She recalled that "he said he wanted me out of jail." When asked what her response to Pinckney's announcement was, Bush recalled saying, "Do what you have to do."
It is upon this, and this only, that the Government seeks a reduction of Bush's sentence.

Legal Analysis
As noted, the Government seeks a reduced sentence for Bush based upon the "surrogate assistance" of her paramour. The parties have called to our attention, and we have found, only one published decision considering "surrogate assistance", United States v. Doe, 870 F.Supp. 702 (E.D.Va.1994). In Doe, Judge Ellis of the Eastern District of Virginia set out a four-part test to govern "surrogate assistance" motions:
1. Did the defendant play "some role" in "instigating, requesting, providing, or directing" the assistance?
2. Would the Government not have received the assistance "but for" the defendant's role in eliciting it?
3. Was the assistance rendered gratuitously?
4. Do any other circumstances weigh against rewarding the assistance?
Doe, 870 F.Supp. at 708.
The first element of the Doe test ensures fidelity to the text of the rule.[2] Rule 35(b) only allows a court to reward a "defendant's ... substantial assistance". If a defendant plays no role in eliciting information useful to the Government, then she has done nothing to "assist[]" the Government, substantially or otherwise. In these cases, Rule 35(b) would give a windfall to a defendant. Doe, 870 F.Supp. at 707.
The second element of the Doe test protects the purpose behind the rule. Rule 35(b) exists to encourage defendants to provide assistance to the Government. In essence, Rule 35(b) should not reward a defendant for assistance that the Government would have received anyway. Id.
The third element of the Doe test seeks to avoid the undesirable market that might arise if a defendant could buy substantial assistance. "It would be fundamentally unjust and would controvert basic notions of equal protection to establish a sentencing scheme that permitted, in essence, a wealthy person to purchase a lighter sentence than that of an indigent". Id. at 708. This third test may oversimplify a substantial-assistance transaction (there exists a ready market for substantial assistance, even if the parties don't trade in dollars), but, in any event, this is not an issue here.
The fourth part of the Doe test emphasizes the discretion traditionally available to a judge in deciding Rule 35(b) motions. Id. Doe suggests that courts apply the factors listed in U.S.S.G. § 5K1.1(a) to guide their discretion.[3] Section 5K1.1(a) lists the following factors:
1. The court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration of the government's evaluation of the assistance rendered;
2. The truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
3. The nature and extent of the defendant's assistance;
4. Any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and

*428 5. the timeliness of the defendant's assistance.
We agree with Judge Ellis to the extent that if a defendant played a material role in "instigating, requesting, providing, or directing" assistance from another, then the defendant may benefit from the surrogate's assistance. It is plain, however, that, far from playing a material or even "some role", Bush did little more than nod her head when her paramour announced his decision to cooperate with the Government, in order to benefit both himself and Bush.
As noted, Bush had ample opportunity before her own incarceration to take a more active role in encouraging Pinckney to cooperate with the Government. Far from doing so, she steadfastly misled ATF, her Probation Officer, this Court and the Court of Appeals with her shifting lies about the motive for purchasing so many fearsome weapons.
Further, Judge Ellis's four-part test inquires as to whether any other circumstances "weigh against rewarding the assistance" Id. at 708. Even if we could, without violence to the English language, describe Bush's "Do what you have to do" response to Pinckney's announcement as assistance, we could scarcely with justice reward a defendant who, without regard to her oath, lied to this Court, as well as lied to the Court of Appeals, her Probation Officer and the investigating ATF agents.

Conclusion
In sum, Bush is the least likely candidate for sentence reduction based upon "surrogate assistance". We will therefore deny the Government's motion in the accompanying Order.
NOTES
[1] The confusion over the number of Bush's sisters extended even to her own counsel, who thought Bush had three sisters. 10/14/94 Hrg. Tr. at 34.
[2] Rule 35(b) reads in relevant part:

(b) REDUCTION OF SENTENCE FOR CHANGED CIRCUMSTANCES. The court, on motion of the Government made within one year after the imposition of the sentence, may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense....
[3] U.S.S.G. § 5K1.1 and Rule 35(b) differ only in their timing. Section 5K1.1 applies before sentencing, and Rule 35(b) applies after.